UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CAMILA M. CAMPOS,            )
Individually, and as         )
Administratrix of the Estate )
of Andre Martins,            )
    Plaintiff,          )
                             )        C.A. No. 09-11852-MLW
       v.                 )
                             )
CHRISTOPHER VAN NESS and     )
the TOWN OF YARMOUTH,        )
    Defendants.         )

MEMORANDUM AND ORDER

WOLF, D.J.                                September 29, 2014

I.  INTRODUCTION

On July 28, 2008, following a high-speed vehicular chase through a residential neighborhood, Yarmouth, Massachusetts police officer Christopher Van Ness shot and killed Andre Martins. Martins' girlfriend, Camila Campos, who was also a passenger in Martins' car, brought a Fourth Amendment excessive force claim against Van Ness in both her individual capacity and as administratrix of Martins' estate.

On May 19, 2014, following seven days of trial and three days of deliberations, the jury was unable to reach a unanimous verdict on either claim. However, the jury did make unanimous findings on two of the three factual questions presented to it. The court declared a mistrial, directed entry of the factual findings, and ordered the parties to brief the issue of qualified immunity in

light of the jury's factual findings.  A hearing on that issue was held on June 20, 2014.

For the reasons explained below, the court finds that Van Ness is entitled to judgment as a matter of law with respect to the claims by Campos individually and on behalf of Martins because he is shielded by qualified immunity as to both.  Therefore, judgment is being entered for the defendant.

II.  PROCEDURAL HISTORY

A.  Pre-Trial Proceedings

On October 30, 2009, Campos filed suit, seeking relief under 42 U.S.C. §1983, against Van Ness and the Town of Yarmouth. Asserting claims individually and in her capacity as administratrix of Martins' estate, Campos alleged that Van Ness had violated Martins' Fourth Amendment rights and her own by using excessive force to terminate a police chase, resulting in Martins' death.

On January 5, 2012, Judge Edward F. Harrington denied the defendants' motion for summary judgment without an opinion.  The defendants appealed.  On April 1, 2013, the First Circuit dismissed the appeal for lack of jurisdiction.  See Campos v. Van Ness, 711 F.3d 243, 248 (1st Cir. 2013).  Despite the existence of factual disagreements concerning whether the car was moving when Van Ness fired the first shot, the defendants claimed that an interlocutory appeal was appropriate because "[Campos'] account 'is so blatantly contradicted by the record . . . '" that it should not be credited.

Id. at 245 (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).  As
the First Circuit summarized this argument:

> While defendants-appellants dispute several aspects of
> Campos's story, they are primarily asking us to set aside
> two claims she has made that are relevant to the issue of
> qualified immunity: (1) that Martins's car was not moving
> when Van Ness fired the fatal shot; and (2) that the car
> began moving only after that point and did not move near
> Van Ness.   Her testimony on those two points, in
> defendants-appellant's view, contradicts the opinions of
> her own accident reconstruction and ballistics experts.

Id. at 246-47.

The First Circuit, however, explained that neither the
accident reconstruction report nor the ballistics report
necessarily discredited Campos' account.   The accident
reconstruction report "does not establish when, within th[e]
movement sequence [of Martins's car], Van Ness fired," and the
ballistics report "seems to have assumed the truth of Van Ness's
account."  Id. at 247.  The First Circuit explained that "[w]e are
therefore a long way from the videotape in Scott that captured the
car chase in question and 'quite clearly contradict[ed]' the
plaintiff's account."  Id. (alteration in original) (quoting Scott,
550 U.S. at 378).  The First Circuit concluded:

> In short, defendants-appellants have not convinced us
> that Campos's story is so "blatantly contradicted by the
> record . . . that no reasonable jury could believe it."
> Scott, 550 U.S. at 380.  Nor have they attempted, in the
> alternative, to accept all of Campos's facts and
> inferences as true and "argue that even on [Campos's]
> best case, they are entitled to immunity."  Mlodzinski
> [v. Lewis], 648 F.3d 24, 28 (1st Cir. 2011).   We
> therefore dismiss the appeal for lack of jurisdiction.
> See id.

Campos, 711 F.3d at 248 (footnote omitted).  Because the dismissal was based on lack of jurisdiction, the First Circuit did not decide the question of whether, even if the plaintiff's account had been discredited, the defendants would be entitled to summary judgment.

In anticipation of Judge Harrington's retirement, the case was reassigned to this court on October 8, 2013.  The court held pretrial conferences on February 27, 2014 and April 22, 2014.  The parties agreed to the dismissal of Campos' Massachusetts Civil Rights Act claim (Count II) and municipal liability claim (Count III), eliminating the Town of Yarmouth as a defendant and restricting the legal issues to the Fourth Amendment claims.  See Apr. 23, 2014 Order; Stipulation of Dismissal with Prejudice.

B.  The May 2014 Trial

At trial, the jury heard testimony from witnesses called by the plaintiff: (1) Campos; (2) Van Ness; (3) Officer Christopher A. Kent; (4) Officer Kevin Leon Antonovich; (5) Officer Neal Donohue; (6) and Officer Erica Wenberg.  The plaintiff also read to the jury the deposition testimony of Dr. Henry M. Nields, the medical examiner who examined Martins' body after the shooting.  In addition, the plaintiff proffered expert testimony from George Kirkham on whether Van Ness' actions were objectively reasonable. However, after a voir dire, the court excluded Kirkham's proposed testimony.  See May 13 Tr. 72-75.  The plaintiff read certain stipulations to the jury.  See May 14 Tr. 51:4-17.  She did not

4

call Dr. Zhukov, her accident reconstruction expert, and the court excluded Zhukov's report. See May 12 Tr. 81-82.

On May 14, 2014, after the plaintiff rested, the defendant moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(a). See May 14 Tr. 52. The defendant argued that because no reasonable trier of fact could find that Van Ness shot at Martins' car when the car was not moving, judgment should enter in favor of Van Ness either on the Fourth Amendment claim or based on qualified immunity. The court denied the motion, concluding that the jury could reasonably credit Campos' testimony that the car was not moving when Martins was shot, and that even if the car were moving, the constitutional issue would not necessarily be resolved. See May 14 Tr. 53-54.

The defense then presented two witnesses: (1) State Trooper Paul Chastenay, who worked on accident reconstruction; and (2) Officer Melissa Alden. The defendant also read into evidence excerpts from the deposition of Theodosios Sperounis, who was a witness to part of the incident. See May 14 Tr. 101.

During its deliberations, the jury asked several questions, and eventually indicated that it might not be able to reach a unanimous verdict on either claim. Following three days of deliberations, the jury reported that it was at an irresolvable impasse regarding the ultimate questions in the case. See May 19

Tr. 28.  However, the jury was able to unanimously decide two of
the three factual questions they were asked to resolve:

- 1(b)(i): "Did Officer Van Ness shoot Mr. Martins before
  Mr. Martins' car began moving?" **No.**

- 1(b)(iii): "Was Mr. Martins' car moving, but not at
  Officer Van Ness, when Officer Van Ness shot him?" **Yes.**

See id. 29:1-9.  The jury was not able to unanimously decide
Question 1(b)(ii): "Was Mr. Martins' car moving at Officer Van Ness
before Officer Van Ness shot him?"  See id. 29:13-15.

On May 19, 2014, the court declared a mistrial on all claims
and directed the Clerk to enter the jury's two factual findings.
See id. 29.

C.  Post-Trial Orders

After declaring the mistrial, the court ordered the parties to
brief the qualified immunity issues concerning Martins and Campos
separately, and to address the implications of Brosseau v. Haugen,
543 U.S. 194 (2004).  A hearing on the issue of qualified immunity
was held on June 20, 2014.

III. STANDARD OF REVIEW

The defendant did not file a renewed motion for judgment as a
matter of law pursuant to Federal Rule of Civil Procedure 50(b)
following the declaration of a mistrial.  See González Pérez v.
Gómez Aguila, 312 F. Supp. 2d 161, 164 (D.P.R. 2004) (Rule 50
motion is permissible after a mistrial).  However, the court
essentially preempted such a motion by ordering the parties to

brief the issue of qualified immunity. Therefore, as the parties

agreed at the June 20, 2014 hearing, <u>see</u> June 20, 2014 Tr. 4, the

court is now applying the Rule 50 standard for judgment as a matter

of law.

The First Circuit has explained that:

> When a qualified immunity defense is pressed after a jury
> verdict, the evidence must be construed in the light most
> hospitable to the party that prevailed at trial. One
> difference [from a motion for summary judgment] is that,
> in such an exercise, deference should be accorded to the
> jury's discernible resolution of disputed factual issues.

<u>Iacobucci v. Boulter</u>, 193 F.3d 14, 23 (1st Cir. 1999) (citations

omitted).

The First Circuit has not addressed the appropriate standard

of review when, as here, the jury returned only a <u>partial</u> verdict

and <u>neither</u> party prevailed at trial. However, the First Circuit

has suggested that the post-trial qualified immunity analysis is

similar to that used to analyze a motion for summary judgment filed

before trial, <u>see</u> <u>Iacobucci</u>, 193 F.3d at 23, and has indicated that

in both postures it is appropriate to "construe the . . . evidence

in the light most favorable to the non-movant," <u>Wilson v. City of</u>

<u>Boston</u>, 421 F.3d 45, 53 (1st Cir. 2005).

This standard of review is also similar to that employed when

a party moves for judgment as a matter of law under Federal Rule of

Civil Procedure 50.[1] Rule 50 provides that "[i]f a party has been

_____

[1] The plaintiff employed the Rule 50 standard in her brief:
"Campos addresses the issue as if Van Ness was seeking qualified

fully heard on an issue during a jury trial and the court finds

that a reasonable jury would not have a legally sufficient

evidentiary basis to find for the party on that issue," the court

may "resolve the issue against the party." Fed. R. Civ. P. 50(a).

Such a motion "may be filed even if a mistrial has been declared."

González Pérez, 312 F. Supp. 2d at 164 (citing DeMaine v. Bank One,

Akron, N.A., 904 F.2d 219, 220 (4th Cir. 1990)).

In evaluating such a motion:

> The court considers "[a]ll of the evidence and reasonable
> inferences drawn from the evidence . . . in the light
> most favorable to the non-moving party," and may not
> evaluate the credibility of the witnesses or the weight
> of the evidence. Malone v. Lockheed Martin Corp., 610
> F.3d 16, 20 (1st Cir. 2010) (alteration in original)
> (quoting Espada v. Lugo, 312 F.3d 1, 2 (1st Cir.2002))
> (internal quotation marks omitted). However, "the
> plaintiff is not entitled to inferences based on
> speculation and conjecture." Id. (quoting
> Vázquez-Valentín v. Santiago-Díaz, 385 F.3d 23, 30 (1st
> Cir. 2004), rev'd on other grounds, 546 U.S. 1163 (2006))
> (internal quotation marks omitted).

Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012).

Furthermore, the court "must disregard evidence supporting the

moving party unless it is both uncontradicted and unimpeached."

Muñoz v. Sociedad Española De Auxilio Mutuo y Beneficiencia De

Puerto Rico, 671 F.3d 49, 55 (1st Cir. 2012) (citing Reeves v.

Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000)).

---

immunity by a Rule 50 motion for judgment as a matter of law
following a jury trial."  Pl.'s Memo. at 4.  In addition, the
defendant has explicitly stated that he is entitled to judgment
as a matter of law.  See Def.'s Response to Pl.'s Memo. at 1.

IV.  FACTS

In finding the facts for present purposes, the court is employing the Rule 50 standard and giving "deference . . . to the jury's discernible resolution of disputed factual issues." <u>Iacobucci</u>, 193 F.3d at 23.  Therefore, the court accepts the jury's factual determinations: (1) that Van Ness did not shoot Martins before Martins' car began moving; and (2) that Martins' car was moving, but not at Van Ness, when Van Ness shot him.

The facts are, for present purposes, as follows.  Relevant factual disputes that were not resolved by the jury are noted.[2]

As the parties stipulated: (1) "This matter arises from an incident which occurred on July 27, 2008 on Baxter Avenue in Yarmouth, Massachusetts."  (2) "The defendant, Yarmouth Police Officer Christopher Van Ness, was acting under color of law at all times relevant to this lawsuit on July 27th, 2008."  (3) "Andre Martins died on July 27, 2008 of a gunshot wound."  (4) "At the time of his death, Andre Martins was 25 years old." (5) "Camila M. Campos and Andre Martins are the natural parents of LM. . . and DM

---

[2] The factual account concerning the chase, prior to the arrival on the lawn of 41 Baxter Avenue, is taken largely from the plaintiff's direct examination of Van Ness.  Although this approach might seem to discount the testimony of Campos, the facts section in the plaintiff's memorandum relies almost entirely on Van Ness' testimony in response to questions from Campos' counsel, and does not cite any of Campos' testimony.  <u>See</u> Pl.'s Memo. at 4-9.  Therefore, with regard to certain matters, Van Ness' testimony is not disputed and, to that extent, may be accepted as true for present purposes.  <u>Muñoz</u>, 671 F.3d at 55.

. . . .    LM . . . was five years old on July 27th, 2008;  DM . .
. was two years old on July 27th, 2008."  May 14 Tr. 51; <u>see</u> <u>also</u>
Stipulations.

At about 1:00 a.m. on Sunday, July 27, 2008, Martins was
driving his Lincoln Mark VIII south on Bay View Street in Yarmouth.
May 9 Tr. 92-93.  Campos was in the passenger seat.  <u>See</u> May 8 Tr.
39.  Campos and Martins had spent the evening together, and had
just left the parking lot of a bar called Pufferbellies.  <u>See</u> <u>id.</u>
39.

Van Ness, in his police cruiser, was parked next to Officer
Kent, in a pickup truck, in a parking lot facing north near Bay
View Street.  Van Ness and Kent were speaking with their drivers'
windows next to each other, with Van Ness' cruiser pointed north.
May 9 Tr. 93.  Van Ness "heard the sound of an engine
accelerating," looked up towards Bay View, and soon saw Martins'
car come into view.  <u>Id.</u> 93.  Van Ness testified that the car made
a left turn "at a high rate of speed," <u>id.</u> 95, and also said that
the car traveled about 25 feet in a matter of two seconds, <u>id.</u> 97.
Campos, however, testified that Martins was not speeding when he
made the turn.  <u>See</u> May 8 Tr. 41.  This dispute is not material.

In any event, Van Ness began to pursue Martins.  Van Ness lost
sight of Martins at first, but quickly relocated him when Martins
was about halfway down Park Avenue, for which the speed limit was
30 miles per hour.  <u>Id.</u> 100-02, 114.  Van Ness accelerated to catch

10

up with Martins. Id. 103. At a speed of 45-50 miles per hour, he was able to close the gap with Martins to about 50 yards by the time Martins approached the stop sign at the end of Park Avenue. Id. 104-08, 111. Van Ness activated his blue overhead lights as Martins was approaching the stop sign. Id. 105. He turned on his siren when Martins disregarded the stop sign and turned left on Glenwood. Id. 108.

At this point, Van Ness made a radio call, alerting dispatch and other officers to the chase. See May 12 Tr. 121. The evidence included a recording of that call. See Ex. 69. The recording included a response from Officer Wenberg, who was stationed at the intersection of Route 28 and Baxter Avenue, north of where the chase would ultimately terminate. See May 12 Tr. 122. The recording of the call, which ended after the shots were fired, lasted about ninety seconds, indicating the rapid speed at which the incident unfolded.

Van Ness testified that, after turning on to Glenwood, Martins accelerated and "started to pull away" from Van Ness, who was by then traveling 50-55 miles per hour. May 9 Tr. 115. After less than a quarter of a mile, Glenwood turned into Harbor Road. See id. Glenwood is a winding road that required Van Ness to slow down to about 40-50 miles per hour, maintaining his distance from Martins. See id. 117.

11

A Toyota Corolla was stopped at a stop sign at the intersection of Harbor Road and Baxter Avenue. Martins entered the left lane, drove around the Corolla, disregarded the stop sign, and turned left on Baxter Avenue, heading north towards Route 28. See id. 119. Van Ness also drove around the Corolla, and was traveling about 15 miles per hour as he turned on to Baxter. Id. 119. He testified that Martins accelerated rapidly on Baxter and was 150-200 yards ahead of him. Id. 122. Campos testified that Martins reached speeds of about 90 miles per hour on Baxter. See May 8 Tr. 47. Van Ness testified that his cruiser accelerated to a maximum speed of about 70 miles per hour. See May 9 Tr. 120.

Looking north on Baxter, Van Ness saw Wenberg's cruiser approaching from Route 28. Wenberg testified that she could see Martins' car "all over the road," May 13 Tr. 113, and that she "was concerned that he was going to make it out on to Route 28 and strike somebody that was walking [or] riding their bike," id. 114. Van Ness testified that, at that time of night, traffic on Route 28 was typically "very busy . . . . [T]he Cape being a resort area, there's a lot of people that come down, and at that hour, bars are getting out, restaurants, [and] people are heading back to the motels, [or] their summer houses . . . . " May 12 Tr. 100-01. Campos did not present any evidence to contradict the testimony that Route 28 was busy at that time of night.

As Wenberg drove south on Baxter Avenue, towards Martins and Van Ness, she pulled her cruiser across the road at an angle, so that it was blocking traffic from both directions, about 100 yards north of 41 Baxter Avenue.  May 9 Tr. 125-26.

After seeing Wenberg's cruiser, Martins braked heavily, and Van Ness closed the distance between the two cars.  With Van Ness about fifteen feet behind, Martins took a left turn on to the lawn of the house at 41 Baxter Avenue.  Id. 127.

What occurred on the lawn of 41 Baxter is the crux of the case and was disputed at trial.  Again, except for the facts expressly found by the jury, the following evidence is presented in the light most favorable to the plaintiff and relevant factual disagreements are noted.

As Martins attempted to make a U-turn on the lawn of 41 Baxter.  Van Ness also drove on to the grass.  While Martins' Lincoln was facing the house, midway through the U-turn, Van Ness rammed the driver's side rear quarter panel of the vehicle with his push bar at about 10 miles per hour.  See id. 129.  The impact caused the Lincoln to spin counterclockwise and come to rest facing Baxter Avenue and slightly south.  Van Ness testified that the cruiser and the Lincoln were essentially "parallel," facing opposite directions.  Id. 131; May 15 Tr. 10, 24, 20, 24.  Martins' car was about two feet from the leading edge of the cruiser, and the left sides of the cars were about five feet apart.  See May 12

13

Tr. 19.  Van Ness drew a diagram of the relative location of the vehicles, which was comparable to his testimony.  See Ex. P.

Van Ness got out of his cruiser, stood behind the door of the cruiser, and pointed his service pistol at Martins.  See May 12 Tr. 16.  For the first time, Van Ness was able to see that there was a passenger in the car.  Id. 63.  While using the door for cover, Van Ness ordered Martins to show his hands.  See id. 16.  Van Ness repeated this order about three times in five or six seconds.  Id. 21.[3]

Van Ness testified that, after those five to six seconds in which Martins' car was stopped, Martins began to accelerate forward.  See id. 23.  Van Ness also testified that Martins was "[j]ust coming straight at me."  Id. 23.  As explained earlier, the jury did not unanimously find that the car was moving at Van Ness before Van Ness shot Martins, see May 19 Tr. 29; rather it was evidently divided on this issue.  Van Ness testified that the vehicle was moving at about 8 miles per hour as it drove past him.  See May 12 Tr. 32:7-8.

Van Ness also testified that, although the front of Martins' car passed by without contact, some part of the left side of the vehicle "made contact with [him]."  Id. 27:5-8.  Van Ness stated

---

[3] Although Campos did not testify to having heard Van Ness' commands, she did not contradict Van Ness' testimony that he issued those orders.  She did testify that Van Ness had his gun drawn and visible before firing at Martins.  See May 7 Tr. 67.

that he was struck on the outside of his left leg, but that he was not knocked off balance or injured. See id. 29. He did not report any injury to anybody until later in the evening, when he spoke with other officers and the president of the police union. See id. 68-69. A photograph of the part of Van Ness' body allegedly hit, taken shortly after the incident, did not reveal any bruising or other sign of injury. See id. 46-47, 49-50; Ex. 33. For present purposes, the court assumes that Van Ness was not struck by Martins' vehicle.

As Martins drove by at about 8 miles per hour, with Van Ness standing about three feet away, Van Ness fired into the car through the open driver's side window. See May 12 Tr. 31. Van Ness testified that he saw Martins "slouch to the right" when the first shot was fired, but he did not then know that he had struck Martins with the first shot. Id. 55. Van Ness now acknowledges that the first shot struck and killed Martins. See id.

As the Lincoln continued moving forward, Van Ness fired two more shots. Van Ness testified that he "thought [he] had fired [his] weapon twice in total," id. 33, and that when he fired the second shot, he "thought [Martins' car] was still right next to [him.] The shots were in quick succession," id. 34. However, the evidence showed locations of three shell casings, indicating that Van Ness fired three shots, not two. See id. 61. The second shot shattered the rear window of the Lincoln, see id. 34, while the

third shot grazed the top of the Lincoln's roof, back to front, <u>see</u> <u>id.</u> 36. The first two shell casings were on the lawn, near the cruiser door, a few feet apart. <u>See</u> <u>id.</u> 59; Ex. 14. The third shell casing was several feet away, on the edge of the lawn, <u>see</u> Ex. 16, indicating that Van Ness had moved toward Baxter Avenue when he fired the third shot.

The Lincoln came to a stop "40 or 50 feet" south on Baxter Avenue, with its brake lights on. <u>Id.</u> 62. Van Ness approached the Lincoln from the rear passenger side with his gun in the ready position. <u>See</u> <u>id.</u> 62. Campos emerged from the passenger door. <u>Id.</u> 64. When Van Ness ordered her to show her hands, Campos complied. <u>Id.</u> Although Van Ness handcuffed Campos, he told her that she was not under arrest. <u>Id.</u> When he looked inside the Lincoln, Van Ness saw Martins, who was "gurgling" and had a red stain on his shirt. <u>Id.</u> 65. Soon after, Wenberg came to the vehicle, followed by Officer Kent, who had driven north on Baxter Avenue to get there. <u>See</u> <u>id.</u> 66. Wenberg administered first aid to Martins. <u>See</u> <u>id.</u> 57:9-10. Van Ness remained on the scene for about 10 minutes before he was driven to the police station. <u>See</u> <u>id.</u> 67-68.

Martins was transported to Cape Cod Hospital, where attempts to revive him were unsuccessful, and he was pronounced dead at 1:50 a.m. <u>See</u> Ex. 47. As explained in the deposition of the medical examiner, Dr. Nields, the autopsy indicated that the bullet from

the first shot entered the left side of Martins' back, <u>see</u> May 14
Tr. 37, perforated Martins' heart and lung, <u>see</u> <u>id.</u> 32, and exited
the left side of Martins' chest, <u>see</u> <u>id.</u> 43.  This indicated that
"there was a downward and left-to-right angle of travel of the
bullet." <u>Id.</u> 43.

V.    ANALYSIS

   A.   <u>Qualified Immunity Standard</u>

   In order to decide whether qualified immunity will protect a
public official from liability, a court ordinarily will determine
"(1) whether a public official has violated a plaintiff's
constitutionally protected right; and (2) whether the particular
right that the official has violated was clearly established at the
time of the violation." <u>Raiche v. Pietroski</u>, 623 F.3d 30, 35 (1st
Cir. 2010).  However, as the Supreme Court held in <u>Pearson v.</u>
<u>Callahan</u>, 555 U.S. 223, 236 (2009), a court may determine whether
an officer is entitled to qualified immunity without first
determining whether his or her actions violated the Constitution.
Answering the qualified immunity question first can avoid "a
substantial expenditure of scarce judicial resources on difficult
questions that have no effect on the outcome of the case," which is
"difficult to justify in cases where the constitutional questions
presented are heavily fact-bound, minimizing their precedential
value." <u>Maldonado v. Fonatanes</u>, 568 F.3d 263, 269 (1st Cir. 2009)
(citing <u>Pearson</u>, 223 U.S. at 238)); <u>see also</u> <u>Estrada v. Rhode</u>

Island, 594 F.3d 56, 62 (1st Cir. 2010) (deciding qualified immunity issue first to avoid fact-bound Fourth Amendment claims). The court is, therefore, addressing qualified immunity first, which makes it unnecessary to determine whether Van Ness violated Martins' Fourth Amendment rights.

In its most recent case on excessive force claims under the Fourth Amendment, the Supreme Court restated the familiar standard for qualified immunity:

> An official sued under §1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "'clearly established'" at the time of the challenged conduct. Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011). And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. Id. at 2083-84. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." Id. In addition, "[w]e have repeatedly told courts . . . not to define clearly established law at a high level of generality," id. at 2074, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014). In evaluating whether a right is "clearly established" for the purposes of a given case, the court must decide whether there is "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" al-Kidd, 131 S. Ct. at 2084 (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)); see also Plumhoff, 134 S. Ct. at 2023.

In deciding cases concerning the use of deadly force against a fleeing suspect, the Supreme Court has noted that "this area is one in which the result depends very much on the facts of each case." Brosseau v. Haugen, 543 U.S. 194, 201 (2004) (per curiam). However, precise factual symmetry is not required to show that a right is clearly established. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

The doctrine of qualified immunity is also not restricted to questions of established law. As the First Circuit has explained:

> While qualified immunity is often invoked in cases where
> legal principles are unclear at the time of the disputed
> conduct, it also protects reasonable assessments of fact,
> Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009),
> even if matters might have been handled differently in
> the calm of retrospective appraisal, Roy v. Inhabitants
> of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994). The aim
> of the doctrine in both cases is to avoid the chilling
> effect of second-guessing where the officers, acting in
> the heat of events, made a defensible (albeit imperfect)
> judgment. See id.

Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010).

Therefore, the questions relating to qualified immunity are whether Van Ness' conduct violated rights of Martins or Campos that were "'clearly established' at the time of the challenged conduct," July 27, 2008, Plumhoff, 134 S. Ct. at 2023, and, if so, whether the violation occurred because Van Ness was reasonably mistaken about the facts, Statchen, 623 F.3d at 18.

19

B.  The Claim on Behalf of Andre Martins

Campos argues that "[a]s of July 27, 2008, it had long been the law that it is constitutionally unreasonable to shoot at a fleeing suspect [who] no longer poses a threat of serious physical harm to the officer or others." Pl.'s Memo. on Qualified Immunity at 17-18 (citing Tennessee v. Garner, 471 U.S. 1, 11 (1985); Whitfield v. Melendez-Rivera, 431 F.3d 1, 7 (1st Cir. 2005)). Campos also argues that "Van Ness would have had fair notice that shooting Martins in the back when he did not pose an imminent threat of serious physical harm to him was not constitutionally sanctioned." Id. at 17. Furthermore, Campos contends that "there was no bystander or other person whose physical safety could have been immediately endangered by Martins' actions." Id.

Van Ness, by contrast, argues that the plaintiff has not demonstrated that Brosseau does not resolve the qualified immunity question in his favor. See Def.'s Memo. of Law on Qualified Immunity at 11. The Supreme Court recently summarized its decision in Brosseau as one in which "an officer on foot fired at a driver who had just begun to flee and who had not yet driven his car in a dangerous manner." Plumhoff, 134 S. Ct. at 2023. It characterized Brosseau as a ruling that clarified that as of February 1999, "it was not clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger." Id

20

As explained below, Van Ness is not entitled to qualified immunity with respect to Martins' claim based on his actions allegedly taken to defend himself. However, in view of the precedent that existed in July 2008, Van Ness is entitled to qualified immunity with respect to Martins' claim because of the risk that Martins posed to others.

### 1. Constitutional Standard

In <u>Plumhoff</u>, the Supreme Court recently wrote that:

> A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard. <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386 (1989); <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985). In <u>Graham</u>, we held that determining the objective reasonableness of a particular seizure under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U.S. at 396 (internal quotation marks omitted). The inquiry requires analyzing the totality of the circumstances. <u>See</u> <u>id.</u>

> We analyze this question from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. <u>Id.</u> We thus "allo[w] for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." <u>Id.</u> at 396-97.

<u>Plumhoff</u>, 134 S. Ct. at 2020. The test for excessive force is objective, "without regard to [the officer's] underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively

unreasonable use of force constitutional." <u>Graham</u>, 490 U.S. at 397 (citation omitted).

When an officer shoots a fleeing suspect, his conduct is objectively reasonable when "the officer [using the force] has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." <u>Garner</u>, 471 U.S. at 3. However, the Supreme Court has cautioned against defining "clearly established" rights at this level of generality. <u>See</u> <u>Plumhoff</u>, 134 S. Ct. at 2023. It has explained that "<u>Garner</u> did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force,'" <u>Scott</u>, 550 U.S. at 382. Nevertheless, this framework is appropriate for analyzing the potential justifications for Van Ness' shooting of Martins in the unique factual circumstances of this case.

## 2. <u>The Risk that Martins Posed to Van Ness</u>

The evidence at trial focused primarily on whether Martins posed an immediate risk of harm to Van Ness, and consequently whether Van Ness' use of deadly force was objectively reasonable as a matter of self-defense. The parties disputed many of the relevant facts. Although the jury resolved some of the important factual disputes, it remains unresolved whether Martins drove directly toward Van Ness at any time before Van Ness fired the first, fatal shot. <u>See</u> May 19 Tr. 29. Furthermore, the plaintiff

presented evidence to contradict Van Ness' assertion that he had been struck by Martins' passing car, which would, if proven, support Van Ness' claim that he reasonably feared for his life.

With respect to whether Martins posed a risk of immediate harm to Van Ness, the record is not sufficient to permit the court, rather than a jury, to decide whether Van Ness is entitled to qualified immunity or whether there was an underlying constitutional violation. More specifically, there are two remaining factual questions that would require resolution by a jury if they were material to the outcome of the case. First, could a reasonable officer in Van Ness' position have believed that Martins posed a significant threat to the officer at some time during the sequence of events on the lawn of 41 Baxter Avenue? Second, if belief in such a risk was reasonable at one time, did that belief become unreasonable by the time the fatal shot was fired?

As the plaintiff correctly argues, in 2008, there was a consensus of cases outside the First Circuit that clearly established that an officer is not permitted to use deadly force in self-defense once the risk from the fleeing suspect has abated. See, e.g., Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999) (reversing grant of summary judgment to officer who "may have had time to get out of the way, take aim, and fire" at fleeing suspect, and explaining that "[a] passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect" (citing

23

Ellis v. Wynalda, 999 F.2d 243, 247 (7th Cir. 1993)); Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."); Hathaway v. Bazany, 507 F.3d 312, 321 (5th Cir. 2007) (agreeing with Waterman that deadly force may sometimes become "unjustified because the officers could have actually perceived the passing of the threat"); Smith v. Cupp, 430 F.3d 766, 774-75 (6th Cir. 2005) ("[T]his is not a case where a dangerous situation evolved quickly to a safe one before the police officer had a chance to realize the change.").

Viewed in the light most favorable to the plaintiff, the evidence in this case would permit a jury to conclude that by the time the fatal shot was fired a reasonable officer in Van Ness' position would have realized that the risk to him had passed. As Van Ness himself testified, Martins' car was traveling at about 8 miles per hour as it left the lawn of 41 Baxter. See May 12 Tr. 32. It is undisputed that Van Ness fired the fatal shot from beside the driver's side window. Id. 31. The medical examiner testified that the fatal shot entered Martins' body through his back, indicating that the car was moving past Van Ness when the shot was fired. See May 14 Tr. 43. Moreover, the second and third shots were fired as Martins drove away from Van Ness, who was no longer in any danger himself.

Although Van Ness testified that he had been struck by some portion of the side of Martins' car as it passed, heightening his apprehension of harm, the plaintiff introduced evidence to contradict that testimony, including the fact that Van Ness did not claim to have been hit until he spoke with union officials at the police station, _see_ May 12 Tr. 68-69. In addition, a photograph taken shortly after the incident showed no signs of injury. _See id._ 46-47, 49-50; Ex. 33. Although a reasonable jury could choose to believe Van Ness' testimony, for present purposes the court must assume that Van Ness was not struck by Martins' vehicle. _See_ _Iacobucci_, 193 F.3d at 23. In any event, Van Ness acknowledged that the alleged impact did not knock him down or off balance, which would have supported his argument that the shooting was reasonable. _See_, _e.g._, _Thomas v. Durastanti_, 607 F.3d 655, 666 (10th Cir. 2010) (finding that officer had made a reasonable mistake, crediting officer's argument that "because he had been struck and propelled over the hood of the Lincoln, he was disoriented and fired the shots while believing that the Lincoln was still approaching him (even though it clearly was headed away from him)").

Finally, although the First Circuit has recognized that qualified immunity may exist when the officer makes a reasonable mistake of _fact_, _see_ _Statchen_, 623 F.3d at 18, that principle does not apply here. Again, it remains disputed whether Martins' car

25

ever moved at Van Ness before he shot Martins. A jury could find that in view of the vehicle's slow speed, a reasonable officer in Van Ness' situation would have had enough time to reevaluate the risk that Martins posed and realized that he was not a significant threat to the officer.

Therefore, the evidence is insufficient to justify a finding of qualified immunity based on the risk that Martins posed to Van Ness.

### 3.   The Risk that Martins Posed to Others

The evidence does, however, establish that Van Ness is entitled to qualified immunity because, based on the undisputed facts, the level of risk that Martins' conduct posed to third parties was high enough to place Van Ness' use of lethal force within the "hazy border between excessive and acceptable force." Saucier v. Katz, 533 U.S. 194, 206 (2001). Based on the law as of July 2008, an officer in Van Ness' position would not have been on notice that shooting Martins was an unreasonable use of force in violation of the Fourth Amendment.

As explained earlier, there was considerable, uncontested evidence at trial about what a reasonable officer in Van Ness' position would have known about the risks that Martins posed as a result of his attempt to flee. It included the undisputed evidence that: Martins ignored two stop signs, see May 9 Tr. 108, 119; he drove across the centerline of Harbor Road to circumvent another

motorist, <u>see</u> <u>id.</u> 119; he was "all over the road" as he drove north on Baxter, May 13 Tr. 113; he reached a speed of 90 miles per hour in a residential neighborhood according to Campos, <u>see</u> May 8 Tr. 47; his original path on Baxter would have taken him directly to Route 28, which typically had substantial vehicular, bicycle, and pedestrian traffic at that time on a Saturday night, <u>see</u> May 12 Tr. 100-01; May 13 Tr. 114; he drove on the lawn of a residence in an attempt to evade Van Ness and Wenberg, who was stopped north on Baxter, <u>see</u> May 9 Tr. 127; he disregarded Van Ness' repeated orders, at gunpoint, to show his hands, <u>see</u> May 12 Tr. 21; note 3, <u>supra</u>; he attempted to drive off the lawn, past Van Ness' cruiser, <u>see</u> May 12 Tr. 30-32; and other officers, including Wenberg, were known to be near or headed to 41 Baxter in response to Van Ness' radio call, <u>see</u> May 13 Tr. 115.

There was also evidence that would tend to diminish the risk to the general public and other officers that would be reasonably perceived. For example, Martins' attempt to make a U-turn at 41 Baxter indicated that he was trying to avoid a collision with Wenberg and suggested that he then no longer intended to travel towards Route 28, where his reckless driving would have posed the greatest risk. However, a reasonable officer in Van Ness' situation, without the benefit of hindsight, would have reasonably been concerned that Martins would continue north on Baxter, encounter Wenberg, and possibly get around her and on to Route 28.

Thus, even viewing the facts in the light most favorable to Campos, a reasonable officer in Van Ness' position could have believed that Martins posed a substantial, imminent threat to other officers and civilians in the area, particularly on Route 28.

The essential question in determining whether Van Ness is protected by qualified immunity, therefore, is whether in July 2008 it was clearly established that this level of risk to others did not justify the use of deadly force. As explained below, neither the parties nor the court have identified a case decided before July 2008 that "squarely governs the case here," Brosseau, 543 U.S. at 201, and while this Court is not deciding whether Van Ness' conduct violated the Fourth Amendment, some analogous cases to reach the issue have found no Fourth Amendment violation as a matter of law. Most importantly for qualified immunity purposes, the divided body of circuit cases demonstrates that Van Ness' actions "fell in the 'hazy border between excessive and acceptable force.'" Id. (quoting Saucier, 533 U.S. at 206) (internal quotation marks omitted). Therefore, Van Ness is entitled to qualified immunity.

As the Supreme Court recently explained in Plumhoff, "Brosseau makes plain that as of February 21, 1999 -- the date of the events at issue in that case -- it was not clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger." Plumhoff, 134 S. Ct. at 2023. The

Court went on to find that this remained true at least until July 18, 2004, the date of the incident in <u>Plumhoff</u>. <u>Id.</u> Campos is similarly situated to the plaintiff in <u>Plumhoff</u>, where the Court observed:

> To defeat immunity here, then, [the plaintiff] must show at a minimum either (1) that the officers' conduct in this case was materially different from the conduct in <u>Brosseau</u> or (2) that between February 21, 1999, and [the date of the alleged violation], there emerged either "'controlling authority'" or a "robust 'consensus of cases of persuasive authority,'" <u>al-Kidd</u>, 131 S. Ct. at 2084 (quoting <u>Wilson</u>, 526 U.S. at 617 (some internal quotation marks omitted), that would alter [the] analysis of the qualified immunity question.

<u>Plumhoff</u>, 134 S. Ct. at 2023. Supreme Court precedent, as well as circuit court decisions in the years between <u>Brosseau</u> and July 2008, show that no such consensus emerged.

In <u>Brosseau</u>, the defendant police officer saw a fleeing suspect get into a vehicle and believed that he was trying to retrieve a weapon. 543 U.S. at 196. The officer pointed her gun at the suspect and ordered him out of the vehicle, but the suspect instead started the car and began to drive. <u>Id.</u> To stop him, the officer shot the suspect in the back. <u>Id.</u> The officer later explained that she did so because she feared for the safety of the other officers who she believed were in the immediate area, and for the safety of citizens as well. <u>Id.</u>

The Supreme Court found that the officer had qualified immunity for use of deadly force. <u>Id.</u> at 197. The Court reviewed the judicial judgments as of 1999, searching for cases relevant to

the officer's decision, "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." Id. at 200. The Court found that no decision "squarely govern[ed]" Brosseau. Id. at 201. Rather, it concluded that the officer's actions fell within the "hazy border between excessive and acceptable force," and, therefore, Brosseau was protected by qualified immunity. Id.

Similarly, the question faced by the Supreme Court in Scott v. Harris was: "[c]an an officer take actions that place a fleeing motorist at risk of serious injury or death in order to stop the motorist's flight from endangering the lives of innocent bystanders?" 550 U.S. 372, 374 (2007). In Scott, in 2001, an officer observed a driver going eighteen miles per hour over the speed limit and attempted to pull him over, prompting a high-speed chase down two lane roads at speeds exceeding eighty-five miles per hour, with the driver swerving around several dozen cars. Id. at 374-75. To end the chase, the officer pushed his bumper to the rear of the driver's vehicle and caused the driver to lose control, crash, and be seriously injured. Id.

Writing in 2007, the Court found that the officer's conduct was "quite clear[ly]" constitutional as a matter of law. Id. at 381. The Court stated that "in judging whether [the officer's] actions were reasonable, we must consider the risk of bodily harm that [his] actions posed to [plaintiff] in light of the threat to

the public that [the officer] was trying to eliminate." Id. at 383. The Court determined that any reasonable jury would have to find that "[t]he car chase that [plaintiff] initiated . . . posed a substantial and immediate risk of serious physical injury to others," and held that the officer's actions were objectively reasonable under the Fourth Amendment. Id. at 384.

Most recently, in Plumhoff, the Court was confronted with a case where, in 2004, a driver sped away from a police officer after being asked to step out of the car during a traffic stop. 134 S.Ct. 2012, 2017. Several officers chased the driver at speeds of over 100 miles per hour, passing more than two dozen vehicles. Id. The driver was eventually cornered in a parking lot. Id. As the officers exited their vehicles and began to approach him he tried to escape, accelerating into a police cruiser. Id. One officer fired three shots into the car, yet the driver managed to keep driving until two other officers fired twelve more shots towards the car, causing the driver to lose control and killing both driver and his passenger. Id. at 2018.

The Court observed that the driver's "outrageously reckless driving posed a grave public safety risk," and when the officers fired the shots, the chase was not over, as the driver was again attempting to escape. Id. at 2021. The Court determined that "[u]nder the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that

[the driver] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." Id. at 2022. Relying on Scott, the Court found that the officers' firing 15 shots and killing the driver and passenger did not violate the driver's Fourth Amendment rights. Id.

The Court next addressed whether, in the absence of its finding that the conduct in question was constitutional, the officers would have been entitled to qualified immunity. Id. at 2023. Describing Brosseau as holding that an officer "did not violate clearly established law when she fired at a fleeing vehicle to prevent possible harm" to other officers and citizens who might be in the area, and finding no substantial change in legal authority between the date at issue in Brosseau, February 1999, and that at issue in Plumhoff, July 2004, the Court held that the officer was entitled to qualified immunity. Id. at 2023-24.

In Brosseau, Scott, and Plumhoff, the Supreme Court has indicated that, although the analysis in each case is fact specific, see, e.g., Plumhoff at 2020, officers who use lethal force to stop a fleeing driver who poses an imminent public safety risk are at least protected by qualified immunity, and may have acted objectively reasonably as a matter of law. As discussed earlier, the undisputed evidence in the instant case shows that Martins' posed a serious, imminent risk to public safety. See

32

supra. Like the driver in <u>Brosseau</u>, it is undisputed that Martins refused to heed the officer's warnings at gunpoint, <u>see</u> May 12 Tr. 21, tried to drive away from the officer and resume his flight, <u>see</u> May 12 Tr. 30-32, and would be fleeing to an area where other officers and civilians were known to be, <u>see</u> May 13 Tr. 115; May 12 Tr. 100-01. According to Campos' own testimony, Martins exceeded the speed of the driver in <u>Scott</u>, where the Court, writing in April of 2007, found that there was "quite clear[ly]" no constitutional violation, 551 U.S. at 381. While the driver in <u>Scott</u> was driving on a busier road, Martins was driving at high speeds through a residential neighborhood. <u>See</u> May 8 Tr. 47. In addition, like the driver in <u>Plumhoff</u>, Martins drove recklessly and disobeyed officers, May 9 Tr. 108, 119; May 13 Tr. 113, was cornered, and then was shot while attempting to resume his flight. <u>See</u> May 12 Tr. 30-32.

These cases do not necessarily show that Van Ness' conduct did not violate the Fourth Amendment. However, they are similar enough to the instant case that, absent a more recent controlling precedent or the development of a robust consensus in the case law between the time when they were decided and July 2008, a reasonable officer Van Ness' position would not have known that using lethal force against Martins violated his Fourth Amendment rights.

Consideration of the circuit court decisions in the years around 2008 confirms that no such "robust 'consensus of persuasive

authority'" existed in July 2008. al-Kidd, 131 S.Ct. at 2084 (quoting Wilson, 526 U.S. at 617); see also Plumhoff, 134 S.Ct. at 2023. For example, in Cordova v. Aragon, 569 F.3d 1183, 1189 (10th Cir. 2009), the Tenth Circuit considered "whether the substantial but not imminent risk imposed on innocent bystanders and police by a motorist's reckless driving justifies a reasonable officer to use a level of force that is nearly certain to cause the motorist's death." The motorist in Cordova was driving recklessly at night and attempting to ram police cars that blocked his way, but there were no other motorists in the immediate vicinity, making the risk posed by the driver "presumably less 'imminent' than that posed by the driver in Scott." Id. at 1189 (quoting Scott, 550 U.S. at 379).

The Tenth Circuit recognized this to be a novel question in 2009, observing both that at the time of the shooting -- May 2006 -- and the time that it was issuing its opinion -- June 2009 -- "[t]he law in our circuit and elsewhere has been vague on whether the potential risk to unknown third parties is sufficient to justify the use of force nearly certain to cause death." Id. at 1193. Therefore, although the court held that the officer's conduct violated the Fourth Amendment, it found that he was shielded by qualified immunity. Id. at 1195.

In Abney v. Coe, 493 F.3d 412, 414-16 (4th Cir. 2007), the Fourth Circuit found no Fourth Amendment violation where, in 2001,

an officer had rammed a fleeing motorcyclist, causing him to crash, in order to end a chase in which the driver committed several dangerous evasive maneuvers.  The Fourth Circuit found that it was "eminently reasonable to terminate the chase in order to avoid further risks to the lives of innocent motorists."  Id. at 417.

The Sixth Circuit in Williams v. City of Grosse Pointe Park, 496 F.3d 482, 484 (6th Cir. 2007), found no Fourth Amendment violation when, in 2003, a police officer fired several shots into a vehicle containing three suspected criminals after the suspects had smashed into a police car and knocked over a fellow officer in an attempt to escape.  The Court held that the officer's conduct in shooting the driver was objectively reasonable because the driver continued his attempt to escape after the officer drew his weapon and was "willing to risk the safety of officers, pedestrians, and other drivers in order to evade capture."  Id. at 487.

In Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002), the Eleventh Circuit found that police officers probably did not, in 1998, violate the Fourth Amendment and were entitled to qualified immunity when they shot a suspect who had been cornered by officers as he tried to flee.  The court reasoned that the driver's refusal to get out of the car and his reckless driving through a residential area before the shooting, combined with the fact that the shots were fired within a few seconds after cornering

the driver, meant that the driver "would have appeared to reasonable police officers to have been gravely dangerous." Id.

Circuit courts have also denied qualified immunity in similar situations, reasoning that there was insufficient risk to third parties to make the officer's decision to use deadly force reasonable as a matter of law. The common thread in each of these cases is that, viewing the facts in the light most favorable to plaintiff, a jury could find that the officer shot a motorist who posed virtually no immediate risk to third parties. For example, in Kirby v. Duva, 530 F.3d 475, 482 (6th Cir. 2008), the Sixth Circuit found that qualified immunity was unjustified where officers, in 2003, shot a driver who was attempting to flee because, on the plaintiff's account of events, "no one was ever in danger," the driver had never been driving recklessly, and nobody was near the path of the driver's escape. Similarly, in Vaughan v. Cox, 343 F.3d 1323, 1339 (11th Cir. 2003), the Eleventh Circuit denied qualified immunity because it found insufficient danger to justify an officer, in 1998, shooting the driver of a fleeing truck, reasoning that on the plaintiff's version of events the driver had made no aggressive maneuvers and had a clear lane ahead of him when the shots were fired.

In Smith v. Cupp, 430 F.3d 766, 773 (6th Cir. 2005), an officer, in 2002, shot and killed a suspect who had just stolen his police cruiser. The Sixth Circuit denied the officer qualified

immunity because on the plaintiff's facts "there was no immediate danger to anyone in the vicinity" that was grave enough to justify the use of deadly force. Id. Finally, in Sigley v. Parma Heights, 437 F.3d 527, 537 (6th Cir. 2006), the Sixth Circuit denied an officer qualified immunity because, on the plaintiff's account of the facts, the officer who fired the fatal shot "was running behind [the driver's] car, out of danger, and [the driver] drove in a manner to avoid others on the scene in an attempt to flee." Therefore, the Court concluded that "it is not clear whether [the officer] had probable cause to believe that [the driver] posed a significant threat of death or serious physical injury to others." Id. at 536.

This review of circuit court decisions confirms the Tenth Circuit's conclusion in Cordova, 569 F.3d at 1192-93, that in 2006, the law was unclear as to the degree of risk to third parties required to make the use of deadly force reasonable, and shows that it remained unclear as of July 2008. The uncontradicted facts indicate that the risk posed by Martins' continued flight was as great or greater than that posed by the motorists in several of the foregoing cases. See Brosseau, 543 U.S. at 196; Scott 550 U.S. at 375; Cordova, 569 F.3d at 1189; Abney, 493 F.3d at 414-16; Williams, 496 F.3d at 484; Pace, 283 F.3d at 1282; Kirby, 530 F.3d at 482; Vaughan, 343 F.3d at 1339; Smith, 430 F.3d at 273; Sigley, 437 F.3d at 537. As of July 2008, the law was not sufficiently

clear that a reasonable officer in Van Ness' position "would have understood that his conduct violated the Plaintiff['s] constitutional rights." <u>Raiche</u>, 623 F.3d at 36 (quoting <u>Maldonado</u>, 568 F.3d at 269). Rather, once again, Van Ness' conduct fell within the "hazy border between excessive and acceptable force." <u>Saucier</u>, 533 U.S. at 206.

Therefore, Van Ness is entitled to qualified immunity on Campos' Fourth Amendment claim as executrix of Martins' estate.

C. <u>Claims of Camilla Campos Individually</u>

As described earlier, Campos has asserted that her own Fourth Amendment rights were violated by Van Ness. Van Ness is also protected by qualified immunity with regard to that claim.

For an individual's Fourth Amendment rights to be implicated, an officer must intend to acquire physical control of her. <u>See Brower v. Cnty. of Inyo</u>, 489 U.S. 593, 595-96 (1989). As the First Circuit has stated, "[i]t is intervention directed at a specific individual that furnishes the basis for a Fourth Amendment claim." <u>Landol-Rivera v. Cruz Cosme</u>, 906 F.2d 791, 796 (1st Cir. 1990).

Van Ness testified that he knew there was a passenger in the vehicle before he shot into and at it. The jury could have found that he intended to shoot and stop the passenger, Campos, as well as Martins. However, based on Van Ness' agreement it was not required to decide this question. Therefore, it is appropriate to assume for present purposes that Campos' Fourth Amendment rights

38

were implicated and force that could be found to have been directed against her was objectively unreasonable.

However, in July 2008, a reasonable officer in Van Ness' position would not have known that his conduct violated Campos' Fourth Amendment rights. As the Supreme Court wrote in Plumhoff with regard to the state of the law in 2004:

> There seems to be some disagreement among lower courts as to whether a passenger in Allen's situation can recover under a Fourth Amendment theory. Compare Vaughan v. Cox, 343 F.3d 1323 (11th Cir. 2003) (suggesting yes), and Fisher v. Memphis, 234 F.3d 312 (6th Cir. 2000) (same), with Milstead v. Kibler, 243 F.3d 157 (4th Cir. 2001) (suggesting no), and Landol-Rivera v. Cruz Cosme, 906 F.2d 791 (1st Cir. 1990) (same). We express no view on this question.

134 S.Ct. at 2022 n.4. As the Supreme Court implicitly indicated in this 2014 statement in Plumhoff, the law had not become clearly established by 2008. Compare Rodriguez v. Passinault, 637 F.3d 675, 684 (6th Cir. 2011) ("By shooting at the driver of the moving car, [the officer] intended to stop the car, effectively seizing everyone inside, including the [passenger].") (quoting Fisher v. City of Memphis, 234 F.3d 312, 318-19 (6th Cir. 2000)), with Troupe v. Sarasota Cnty., 419 F.3d 1160, 1167 (11th Cir. 2005) (shooting to "stop[] a vehicle's driver does not constitute a seizure of the passenger"), and Schultz v. Braga, 455 F.3d 470, 482 (4th Cir. 2006) ("[T]he Fourth Amendment does not protect persons who were merely 'reasonably foreseeable victims' of excessive force inflicted upon another, even if they were themselves targets of a

seizure.").

Therefore, Van Ness is protected by qualified immunity and judgment for him will enter on Campos' individual claim.

VI.  ORDER

In view of the foregoing, it is hereby ORDERED that judgment shall enter for the defendant Christopher Van Ness on plaintiff Camila Campos' claims on behalf of the Estate of Andre Martins and on her own behalf.

           /s/ MARK L. WOLF
           UNITED STATES DISTRICT JUDGE